## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **EDMOND STANTON et al.**, | |
| Plaintiffs, | |
| v. | Case No. 20-cv-02464 (CRC) |
| **POTOMAC ELECTRIC POWER COMPANY**, | |
| Defendant. | |

## <u>MEMORANDUM OPINION</u>

Plaintiffs Edmond Stanton, Booker Tolbert, and Carnell Veney allege that their employer, Potomac Electric Power Company ("Pepco"), has discriminated against them based on their race and retaliated against them for filing complaints about racial discrimination.  They bring several claims under federal law and the District of Columbia Human Rights Act ("DCHRA").  Pepco moved to dismiss the complaint, and, rather than offer a substantive response, sought leave to amend the complaint.  The proposed amended complaint ("PAC") would, among other things, replace Plaintiffs' multiple causes of action under Title VII with a single cause of action under 42 U.S.C. § 1981.  Previously, the Court partially dismissed Plaintiffs' complaint as to certain claims under the DCHRA, barring them from repleading those claims in an amended complaint.  Currently pending before the Court is Plaintiffs' motion for leave to amend, specifically the Section 1981 and few remaining DCHRA claims.  The Court will grant leave to amend in part and deny it in part; the remainder of Pepco's motion to dismiss—i.e., as to the claims not addressed in the Court's June 22, 2021 Minute Order—is thus denied as moot.

Accordingly, the Court will allow Plaintiffs to file an amended complaint consistent with this opinion and the prior Minute Order.  As detailed in this opinion, the Court will grant

Plaintiffs' motion for leave to amend as to the following claims, as identified by the following numbers in the Second Revised Table of Claims, ECF No.19-1:  3, 5, 7, 8, 20, 23, 25, 26, 35, 36, 38, 39, 41.

## I.  Background

### A.  Plaintiffs' Allegations in the Proposed Amended Complaint

This is an employment discrimination case brought by three Plaintiffs who work for Pepco, an electric utility company in the District.  Edmond Stanton is a "Test Specialist" and has worked at Pepco (or its parent company, Exelon) since 2007.  PAC ¶ 4.  Carnell Veney is a "Relay Tech" and has also worked at the company since 2007.  Id. ¶ 6. And Booker Tolbert is a Test Specialist and "the most senior employee" in that department—not surprising, given that he began his employment with Pepco in 1984.  Id. ¶¶ 5, 138.  All Plaintiffs are African-American men.  Id. ¶¶ 4–6.

Plaintiffs allege various instances of racial discrimination and retaliation by Pepco, their supervisors, and coworkers.  In a "table of claims," Pepco broke the complaint down into 43 distinct claims, see ECF No. 6-2, which may more accurately be described as categories of allegations, or events, relevant to particular counts in the complaint.  Both sides refer to this numbering convention, as did the Court in its prior order, so it will continue to do so.

Each Plaintiff's allegations as to his individual claims will be assessed in greater detail, but there are common threads that require some initial background.  First, Plaintiffs generally allege a racist working environment.  For example, they allege that white employees "casual[ly]" use racial slurs "without facing discipline," PAC ¶ 39, and at least Stanton offers specific examples of being called a "coon" by one supervisor and another supervisor saying "n[*****]" directly to him.  Id. ¶¶ 70, 79–80; but see id. ¶ 36 (alleging all "Plaintiffs" have been subjected to

these slurs).  They also allege that a "noose was found hanging in the workplace, an incident that [was] never investigated[.]"  Id. ¶ 36.

Second, Plaintiffs raise claims related to Pepco's "sign-on" program (sometimes called "sign-offs"), and relatedly, claims of denied promotions.  The sign-on program requires employees in the position of relay tester to "rely on supervisors and managers to provide specific assignments where they can demonstrate their skill as relay testers."  PAC ¶ 22.  Sign-on approvals are important, Plaintiffs insist, because "a relay tester's demonstration of increasingly difficult skills leads to promotions and pay increases."  Id.; id. ¶ 23 (alleging employees "must get a manager or supervisor to sign off on specific assignments to qualify for promotion").  Without enough assignments, an "employee is precluded from promotion[.]"  Id. ¶ 23.  Plaintiffs claim that this system discriminates against them, and African-American employees generally, because supervisors routinely approve sign-ons for white employees but not for African Americans, hindering their prospects for promotion.

Third, Plaintiffs allege that they were not assigned company vehicles, and that receiving a vehicle assignment impacts compensation.  Employees with such assignments, Plaintiffs say, get "paid from the time they enter the truck at their home . . . , until the time they park the truck back at their home after the end of their shift."  PAC ¶ 28.  By contrast, employees without company vehicles "are paid from the time they report to their duty assignment until the end of the workday," but not for commute time.  Id.  Plaintiffs allege that Pepco discriminates against African Americans in how it provides company vehicle assignments, though, as will be explained, their individual claims on this issue differ.

Plaintiffs' other claims range from being denied promotions and receiving fewer overtime hours and less pay because of their race, to allegations related to the type of work they

are assigned.  For instance, Plaintiffs generally allege that white employees "are favored for long-term job assignments, as opposed to day-to-day assignments" given to "black relay testers like Plaintiffs[.]"  PAC ¶ 12; id. ¶ 13 (alleging long-term assignments have "exceedingly preferable working conditions and professional treatment" and provide "a degree of predictability and peace of mind").  Relatedly, Plaintiffs assert that employees without long-term assignments, like them, often work "storm duty," which "comes with obvious physical hazards" and "working long days[.]"  Id. ¶ 14–15.

Plaintiffs' PAC advanced four counts.  But, as the case has proceeded, Plaintiffs' claims have been significantly winnowed down.  In brief, what remains at play are claims under: (1) Count I (DCHRA race discrimination) as to Plaintiffs Stanton and Veney; (2) Count II (federal Section 1981 race discrimination) as to all Plaintiffs; and (3) Count IV (DCHRA retaliation) as to all Plaintiffs.

B.  Procedural History

Plaintiffs originally filed this case in D.C. Superior Court in July 2020 and served Defendants Pepco and its parent, Exelon Corporation, on August 4, 2020.  The original complaint alleged claims for race discrimination, hostile work environment, and retaliation under both Title VII and the DCHRA.  See Compl. ¶¶ 107–78, ECF No. 1-1.  Defendants timely removed the case to this Court, see Notice of Removal, ECF No. 1, and then Exelon was dismissed as a defendant.  See Stipulation of Dismissal, ECF No. 5.  Shortly after that, Pepco moved to dismiss, arguing that certain claims were not properly exhausted, untimely, preempted, or barred because Plaintiffs elected administrative remedies, and that Plaintiffs' allegations were not plausible.  See Mot. Dismiss, ECF No. 6; Table of Claims, ECF No. 6-2.

After receiving two extensions, rather than offer a substantive response to Pepco's motion to dismiss, Plaintiffs moved for leave to amend their complaint, attaching the proposed amended version.  See Pls. Mot. Leave to File Am. Compl., ECF No. 12.  The PAC substituted Plaintiffs' Title VII race discrimination, hostile work environment, and retaliation claims for a single federal race discrimination claim under 42 U.S.C. § 1981; the DCHRA claims remained. Plaintiffs also sought to add allegations supporting a putative class action, but they have since withdrawn that portion of the PAC.  See Pls. Reply in support of Mot. Leave to File Am. Compl. ("Pls. Reply") at 2 n.2, ECF No. 18.  Pepco opposed Plaintiffs' motion for leave to amend, and Plaintiffs failed to reply (until the Court later ordered additional briefing).

After that first round of briefing, the Court dismissed a host of DCHRA claims because Plaintiffs failed, either in their brief or the PAC, to respond to Pepco's arguments that those claims were untimely, preempted, or barred by the election of administrative remedies.  See 6/22/2021 Minute Order; Local Civ. R. 7(b); CD Int'l Enters., Inc. v. Rockwell Capital Partners, Inc., 251 F. Supp. 3d 39, 46 (D.D.C. 2017) (party conceded issue by failing to address it in opposition brief); Fox v. District of Columbia, 851 F. Supp. 2d 20, 36–37 (D.D.C. 2012) (denying leave to amend denied as to claims "which plaintiffs conceded by failing to respond to [defendant's] arguments").  That ruling entirely eliminated the DCHRA hostile work environment claims, but left a few DCHRA discrimination and retaliation claims, plus the federal claims, to be decided.  The Court held Plaintiffs' motion for leave to amend in abeyance pending further briefing.  See 6/22/2021 Minute Order.  In accordance with the Court's order, Plaintiffs filed a reply in support of their motion to amend, and Pepco filed a surreply in opposition.

Plaintiffs' motion is finally ripe for this Court's review.

## II.   Legal Standards

Plaintiffs filed their amended complaint more than 21 days after Pepco filed its motion to dismiss, so they may amend the complaint only with leave of the Court.  Fed. R. Civ. P. 15(a). Rule 15(a) gives courts discretion whether to grant leave to amend a complaint, but that discretion is limited; leave "should be freely given in the absence of undue delay, bad faith, undue prejudice to the opposing party, repeated failure to cure deficiencies, or futility." Richardson v. United States, 193 F.3d 545, 548–49 (D.C. Cir. 1999).  A proposed amended complaint is futile if it would not survive a motion to dismiss.  Thus, when a defendant challenges a proposed amended complaint as futile, courts apply the same standards as they would on a motion to dismiss.  See In re Interbank Funding Corp. Sec. Litig., 629 F.3d 213, 215– 16 (D.C. Cir. 2010).  The party opposing amendment bears the burden of showing why leave to file an amended pleading should not be granted.  Smith v. Café Asia, 598 F. Supp. 2d 45, 48 (D.D.C. 2009).

The standard applicable here is Federal Rule of Civil Procedure 12(b)(6).  "To survive a motion to dismiss [under 12(b)(6)], a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Id.  A court "must treat the complaint's factual allegations as true and must grant plaintiff the benefit of all inferences that can be derived from the facts alleged."  Sparrow v. United Air Lines, Inc., 216 F.3d 1111, 1113 (D.C. Cir. 2000) (cleaned up).

### III.  Analysis

The Court will begin with the Section 1981 and DCHRA race discrimination claims, and then it will turn to the DCHRA retaliation claim.  But there are also two preliminary matters to address.  First, as mentioned, all the hostile work environment claims were dismissed in the Court's June 2021 Minute Order, and Plaintiffs have not pled a *federal* hostile work environment count under Section 1981 in the PAC.  See PAC ¶¶ 192–207, 208–18; see also Second Revised Table of Claims, ECF No. 19-1 (no remaining claims under the PAC's Count III for hostile work environment under the DCHRA).[1]  Second, Plaintiffs declined to respond substantively to Pepco's challenge to their proposed class claims in the PAC, but instead decided to "withdraw the putative class claims."  Pls. Reply at 2 n.2.  Consequently, no class claims are presented.

### A.  Section 1981 and DCHRA Race Discrimination Claims

Section 1981 protects the right of "[a]ll persons" to "make and enforce contracts," including "the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship" without respect to race.  Similarly, D.C. Code § 2-1401.11(a)(1)(A), prohibits racial discrimination with respect to individuals' "compensation, terms, conditions, or privileges of employment, including promotion," and makes it unlawful for an employer "to limit, segregate, or classify his or her[] employees in any way which would deprive or tend to deprive any individual of employment opportunities, or otherwise adversely affect his or her[] status as an employee."  Claims under both statutes are "evaluated using the same" three-step McDonnell

---

[1] As Plaintiffs point out, however, "even if Plaintiffs may not recover on particular allegations partially dismissed by the Court," the statements relevant to the hostile work environment claims may be relevant as to whether there is "an inference of discrimination for the surviving claims."  Pls. Reply at 8 (footnote omitted).

<u>Douglas</u> framework for establishing racial discrimination under Title VII.  <u>See</u> <u>Lemmons v.</u>

<u>Georgetown Univ. Hosp.</u>, 431 F. Supp. 2d 76, 86–87 (D.D.C. 2006).

Under that framework, a plaintiff must make out a prima facie case by establishing "that

(1) he is a member of a protected class, (2) he suffered an adverse employment action, and

(3) the unfavorable action gives rise to an inference of discrimination (that is, an inference that

his employer took the action because of his membership in the protected class)."  <u>Forkkio v.</u>

<u>Powell</u>, 306 F.3d 1127, 1130 (D.C. Cir. 2002).  Plaintiffs, however, "do[] not have to plead facts

in [their] complaint that establish a prima facie case," but "need only plead facts that make the

claim plausible."  <u>Leftwich v. Gallaudet Univ.</u>, 878 F. Supp. 2d 81, 100 (D.D.C. 2012) (citing

<u>Twombly</u>, 550 U.S. at 569–70); <u>see also</u> <u>Kruger v. Cogent Commc'ns, Inc.</u>, 174 F. Supp. 3d 75,

81–82 (D.D.C. 2016) (same).

The Court will assess each Plaintiff's claims in turn.

### 1. Stanton

Starting with Mr. Stanton, he has nine remaining race discrimination claims.  As Pepco

frames it, these are claims 1–8 and 18.  <u>See</u> Second Revised Table of Claims.

#### a.   Claims 1, 2, 6, 18:  No Adverse Action

Leave to amend as to claims 1, 2, 6, and 18 would be futile because they involve

allegations related to disfavored work assignments that do not amount to adverse employment

actions.  <u>See</u> PAC ¶¶ 43–44, 48–49, 58–59, 100.  "[F]or there to be an adverse employment

action, there must be a 'significant change in employment status.'"  <u>Walker v. Wash. Metro.</u>

<u>Area Transit Auth.</u>, 102 F. Supp. 2d 24, 29 (D.D.C. 2000) (quoting <u>Burlington Indus., Inc. v.</u>

<u>Ellerth</u>, 524 U.S. 742, 761 (1998)).  Typically, then, adverse action involves "hiring, firing,

failing to promote, reassignment with significantly different responsibilities, or a decision

causing a significant change in benefits." Walker v. District of Columbia, 279 F. Supp. 3d 246, 260 (D.D.C. 2017). But employment actions that, for example, involve "purely subjective injuries, such as dissatisfaction with reassignment, public humiliation, or loss of reputation" do not count as adverse actions. Brown v. Georgetown Univ. Hosp. Medstar Health, 828 F. Supp. 2d 1, 8 (D.D.C. 2011) (citation omitted); Carroll v. England, 321 F. Supp. 2d 58, 69 (D.D.C. 2004).

Stanton's allegations on these claims fall into the latter category of "dissatisfaction" with the work assignments he has—or has not—received. Brown, 828 F. Supp. 2d at 8; Weigert v. Georgetown Univ., 120 F. Supp. 2d 1, 19 (D.D.C. 2000) ("less substantial work assignments" did not amount to adverse action). For instance, Stanton alleges that he "was given day to day, menial assignments" and "grunt work," PAC ¶ 43; he "was not given a long term job assignment, nor was he provided with on-the-job training," id. ¶ 44; he had to work "storm duty," which involved handling power restoration assignments during and after storms, id. ¶¶ 14, 48–49; and that, since a promotion he received in 2020, Pepco has not assigned him "highly technical work," id. ¶ 100. These allegations themselves do not amount to adverse action, and thus do not provide independent grounds for Stanton to pursue a Section 1981 race discrimination claim in an amended complaint.

b.   Claim 3:  Stanton's "Sign-On" Claim

Pepco contests that claim 3, involving Stanton being denied "sign-ons," constitutes adverse action, but this claim is a closer question because of the alleged importance of the sign-on program for qualifying for promotion. See PAC ¶¶ 21–27; id. ¶¶ 44, 61–62. Stanton alleges that he made requests for sign-ons "on at least a monthly bases [sic]" between 2016 and 2019, id. ¶ 61, but that "supervisors refused to consistently sign-off on his work like they did for white

9

employees." Id. ¶ 44.  Even accepting Pepco's framing that these allegations are about

disfavored assignments, the action of denying sign-ons for work "may indeed amount to a

materially adverse consequence affecting the terms, conditions, or privileges of employment or

*future employment opportunities*." Prince v. Rice, 453 F. Supp. 2d 14, 29 (D.D.C. 2006)

(cleaned up) (emphasis added) (quoting Holcomb v. Powell, 433 F.3d 889, 902 (D.C. Cir.

2006)); cf. Weigert, 120 F. Supp. 2d at 19 (noting an "'undesirable reassignment' might

constitute an adverse action" in some circumstances).  The PAC alleges that the sign-on program

requires relay testers like Stanton to "get a manager or supervisor to sign off on specific

assignments to qualify for promotion[.]" PAC ¶¶ 22–23.  Thus, receiving assignments through

the sign-on program is purportedly necessary for promotion.  Denying sign-ons, in turn,

plausibly has a "materially adverse consequence affecting . . . future employment opportunities,"

namely promotions, and thus amounts to adverse action.  Prince, 453 F. Supp. 2d at 29 (cleaned

up).

Further, Stanton's allegations in the PAC regarding an inference of discrimination

establish a plausible claim.  He alleges, for example, that "[w]hite Test Specialists who started at

the same time or after Stanton started working for Defendant were routinely promoted ahead of"

him because of the discriminatory patterns in the sign-on program between white employees and

equally skilled African-American employees.  PAC ¶ 47; id. ¶¶ 23–25; id. ¶ 63 (alleging

"Stanton is just as skilled as the white employees who are permitted to participate in the 'sign-

on' program").  The discriminatory environment is reflected by some of Stanton's other

allegations.  Stanton alleges that, in December 2017, Supervisor Ahmad Awa "stated that he did

not want 'n[******]' on his job," and in other incidents, "Awa asked Stanton 'what do

n[******] think about Africans?'" and "why are n[******] in America so lazy?"  PAC ¶¶ 79–

80.  According to the PAC, Stanton reported this to a higher-level supervisor, but she did

nothing.  Id. ¶ 80.  Plaintiffs also allege that a "noose was found hanging in the workplace,"

which Pepco "never investigated."  Id. ¶ 36.

These allegations of statements that "carr[y] significant derogatory meaning" are enough

raise a reasonable inference that Stanton was discriminated against because of his race.  See

Kruger, 174 F. Supp. 3d at 82–83; Davis v. Joseph J. Magnolia, Inc., 815 F. Supp. 2d 270, 283

n.9 (D.D.C. 2011) (use of racial slur was "sufficient circumstantial evidence" for discriminatory

intent); cf. Ayissi-Etoh v. Fannie Mae, 712 F.3d 572, 576–77 (D.C. Cir. 2013).  Accordingly, the

Court will grant Plaintiffs leave to amend as to claim 3 for Stanton.

c.   Claims 4 and 5:  Stanton's Promotion Claims

Claims 4 and 5 relate to the denial of two different promotions, one in 2017 and the other

in 2018.  Pepco does not dispute that these allegations constitute adverse actions; it contests

instead whether there is an inference of discrimination.  See Second Revised Table of Claims.

The Court concludes that an amendment as to claim 4 would be futile, but claim 5 could survive

a motion to dismiss.

Claim 4 concerns Stanton not being selected for a supervisor position for which he

applied in November 2017.  PAC ¶ 102.  This claim fails because Stanton has not pled that he

was denied the position because of race.  Stanton merely alleges that he "was qualified for the

position, however, the two open positions were given to other employees," one of whom was

"the subject of [a] 2014 sexual harassment complaint" that Stanton had filed.  Id.  Among other

deficiencies, Stanton has not alleged "the race of the parties he compares himself to."  Slate v.

Pub. Defender Serv. D.C., 31 F. Supp. 3d 277, 299 (D.D.C. 2014).  At bottom, there are simply

no allegations in the PAC to make out a plausible claim of race discrimination.

Claim 5 deals with Stanton being "passed over for promotion to Test Specialist" in 2018, and it fares better.  PAC ¶ 45.  "One way a plaintiff can show that an adverse action gives rise to an inference of discrimination is by demonstrating that she was treated differently from similarly situated employees who are not part of the protected class."  See Moore v. Castro, 192 F. Supp. 3d 18, 40–41 (D.D.C. 2016) (quoting Nichols v. Truscott, 424 F. Supp. 2d 124, 135 (D.D.C. 2006)).  Stanton's allegations make that showing.  He alleges that "[l]ess qualified white employees, with less seniority than [him], received promotion to Test Specialist," and that four of the five promoted individuals were white.  PAC ¶¶ 45–46.  The one non-white individual who received a promotion, moreover, "had not filed charges of discrimination" against Pepco. Id. ¶ 46.  This promotion denial is closely tied to the sign-on claim if, as the PAC alleges, white employees less senior than Stanton "were routinely promoted ahead of Stanton because of the discriminatory 'sign-on' policies[.]"  Id. ¶ 47.  And the same allegations regarding racial slurs directed at Stanton, discussed above, support an inference of discrimination on claim 5 as well. Accordingly, the Court will grant Plaintiffs leave to amend as to claim 5 for Stanton.

Pepco counters that Stanton "admits that he was promoted in January 2020," and that he alleges "he was the most qualified"—not that denial of sign-ons rendered him ineligible for promotion.  See Pepco Surreply at 6, ECF No. 19.  That reading of the allegations is a bit too myopic.  Stanton alleges that he was "just as skilled as the white employees" who "had no problems" with the sign-on program, PAC ¶¶ 62–63, but that supervisors did not treat his sign-on requests the same way.  Id. ¶ 44.  It is reasonable to infer, as Stanton's allegations suggest, that this discriminatory treatment delayed his promotion compared to his white colleagues.  See id. ¶ 47.  But it could also be the case that, by 2018 (after having been with Pepco for about eleven years, see id. ¶ 42), Stanton met the qualifications for a promotion, including the

necessary sign-ons, but did not receive it—because he was *again* discriminated against because of race.  Reading the allegations in the light most favorable to Stanton, he has a plausible claim regarding the denied promotion in 2018.

### d.  Claim 7:  Stanton's Vehicle Assignment Claim

Claim 7 deals with Stanton being denied a company vehicle, and the Court concludes the PAC's allegations support a plausible claim—though just barely.  As explained, the PAC alleges that vehicle assignments influence compensation because employees are paid for their commute time to and from work in the vehicle.  PAC ¶ 28.  In January 2018, Pepco apparently received a new fleet of company trucks.  Id. ¶ 51.  Stanton alleges that, even though he was eligible, he "did not receive a company vehicle" at that time; rather, he asserts, vehicles were first assigned "to the white relay testers and other eligible white" employees.  Id. ¶¶ 51–52.  He also avers that, "[i]n 2018/2019, [he] was finally assigned a company vehicle."  Id. ¶ 53.  Although the timeline is muddy, reading these allegations in the light most favorable to Stanton, it suggests at least a year-plus delay in receiving a vehicle based on race.  Stanton's allegations are thinner compared to the other Plaintiffs', but at this early stage they are (barely) enough to show he "was treated differently from similarly situated employees who are not part of the protected class" and support an inference of discrimination.  See Moore, 192 F. Supp. 3d at 40–41.  The Court will grant the motion for leave to amend as to claim 7 for Stanton.

### e.  Claim 8:  Stanton's Overtime Claim

Stanton's final Section 1981 claim involves an alleged significant cut in overtime hours and pay.  Pepco again focuses its challenge on whether there is an inference of discrimination.

The PAC's allegations on this ground support a plausible claim.  Stanton alleges that "[s]ince 2017, [his] overtime hours have been cut in half, resulting in a significant decrease in

pay." PAC ¶ 54. He adds that he "has been denied the same opportunities for overtime hours that are afforded to white relay testers," id., who Stanton says "are given first preference in the selection of overtime hours[.]" Id. ¶ 55; id. ¶ 56 ("Stanton and other African American employees . . . are taught by PEPCO managers and supervisors that overtime hours are assigned to the favored, white employees first and foremost."). Although Pepco points out that Stanton also "acknowledge[s] that overtime was cut for *all* employees," Pepco Surreply at 7, Stanton alleges that happened specifically because of his complaints to human resources and the D.C. Office of Human Rights about alleged racial discrimination. PAC ¶ 66 (alleging this reduction occurred after "Supervisors Jesse Kittrell and Ahmed Awa had informed other supervisors and employees about the details of Stanton's complaints"). Pairing these allegations with the purported racial slurs used by Supervisor Awa in front of Stanton, the PAC alleges a plausible inference of discrimination.

Thus, the Court will grant Plaintiffs leave to amend as to claim 8 for Stanton.

### 2. *Veney*

Moving to Mr. Veney, he has eight race discrimination claims remaining. Several of Veney's claims falter for the same reasons as Stanton's—they do not amount to adverse actions. Thus, claims 21 (denied long-term assignments), 22 (denied training), 24 (storm duty), and 29 (assignment without adequate training), each of which mirrors Stanton's allegations on these issues, fail for lack of adverse action.

That leaves claims 23, 25, and 26, all of which arise under Section 1981 and relate to sign-ons, vehicle assignments, and overtime pay, respectively.

14

a.  Claim 23:  Veney's Sign-On Claim

The Court will grant leave to amend as to claim 23 for Veney.  As explained above,

denying sign-ons constitutes adverse action.  Like Stanton, Veney alleges that he made sign-on

requests on at least a monthly basis between 2016 and 2019 (PAC ¶ 121), but supervisors

"refused to consistently sign-off on his work like they did for white employees" (id. ¶ 109), even

though "Veney is just as skilled as the white employees" (id. ¶ 123).

This claim turns on whether the PAC's allegations support an inference of discrimination.

They do.  Unlike Stanton, Veney does not allege specific instances of directly experiencing racial

slurs, see, e.g., PAC ¶¶ 79–80; rather, he incorporates other allegations that all "Plaintiffs have

been called 'coon' and 'n[*****]' in the workplace," that "[a] noose was found hanging in the

workplace" but was "never investigated," and that all "Plaintiffs . . . believe that Defendants

have ratified and approved" white employees' and supervisors' "casual use of the word

'n[*****]'" because there is no discipline for the use of those slurs.  Id. ¶¶ 36, 39; id. ¶ 106.

Veney also has the same supervisor as Stanton, Ahmad Awa (id. ¶ 129), and Stanton allegedly

"discussed Mr. Awa's overt racism . . . with each of the other Plaintiffs[.]"  Id. ¶ 81; id. ¶ 83

(alleging Awa's general bias against African American employees).

These allegations are enough to survive a motion to dismiss.  "[S]tatements purportedly

made" that "reflect[] an animus against individuals of" a particular racial group and "allegations

that [a] Defendant . . . was generally biased against [such] individuals . . . makes it plausible for

the Plaintiff to claim" racial discrimination.  See Attakora v. District of Columbia, 943 F. Supp.

2d 152, 157 (D.D.C. 2013) (denying motion to dismiss on Title VII and DCHRA national origin

discrimination claims).  To be sure, as Pepco argues, Veney would have an uphill battle for a

hostile work environment claim based on any "statements made by third parties to third

parties[.]"  See, e.g., Burton v. District of Columbia, 153 F. Supp. 3d 13, 87 (D.D.C. 2015) (collecting cases).  But such a claim carries a different standard and raises distinct questions.  See id. at 83.  The issue here is whether Veney makes out a plausible inference of discriminatory intent.  At this early stage, Veney's allegations in the PAC are sufficient.  Attakora, 943 F. Supp. 2d at 157.

### b.   Claim 25:  Veney's Vehicle Assignment Claim

Next is Veney's claim that he was denied a company vehicle, and the accompanying monetary benefits, from 2018 until 2020.  Veney's claim on this ground more comfortably survives compared to Stanton's.  He has alleged a clear delay in receiving a company vehicle. See PAC ¶¶ 113, 115.  And he has alleged facts supporting a claim that he was actually treated differently than white employees:  that Pepco "assigned several white employees to company vehicles three or more years prior to assigning [a] vehicle to [him]," and that he had more seniority than those employees.  See id. ¶ 115.  At this stage, these allegations "demonstrat[e] that [Veney] was treated differently from similarly situated employees who are not part of the protected class" and support an inference of discrimination.  See Moore, 192 F. Supp. 3d at 40–41.  Thus, the Court will grant the motion for leave to amend as to claim 25 for Veney.

### c.   Claim 26:  Veney's Overtime Claim

The PAC's allegations for Veney's claim 26—related to denial of overtime—also support a plausible claim, for many of the same reasons as Stanton's overtime claim.  Veney alleges that he is "just as skilled as the white employees who receive overtime assignments," PAC ¶ 119, but that he has been denied "the same opportunities for overtime hours afforded to white relay

testers." Id. ¶ 116.[2]  Additionally, Veney asserts that he is "routinely denied Sunday double-time hours," despite his high performance as an employee; meanwhile, his "white counterparts"— who "do the bare minimum"— "are routinely assigned to work Sunday double-time hours." Id. ¶ 133.  These allegations, combined with the others already discussed, would be enough to survive a motion to dismiss.  Accordingly, the Court will grant the motion for leave to amend as to claim 26 for Veney.

    *3.  Tolbert*

Finally, Mr. Tolbert.  The Court begins with the two claims that Pepco agrees can proceed under Section 1981:  (1) claim 38, related to Tolbert's allegations that he is paid less than white employees in the same position, despite the fact that his white colleagues have less experience and seniority than him; and (2) claim 39, related to his allegations that, after he filed a complaint with the D.C. Office of Human Rights, he received only a marginal pay raise that was less than that extended to white employees in the same position and to other white employees with the same or less seniority than him.  See PAC ¶¶ 148–50; Def. Opp'n to Pl. Mot. Amend ("Def. Opp'n") at 7 n.4, ECF No. 16; Second Revised Table of Claims.  Accordingly, the Court will grant the motion for leave to amend as to claims 38 and 39 for Tolbert.

That leaves three Section 1981 claims.  Like the other Plaintiffs, Tolbert's claims center on denied promotions, vehicle assignments, and overtime.

---

[2] Although his retaliation-based overtime claim has been dismissed (and cannot be pled in the PAC), see 6/22/2021 Minute Order, Veney alleges that Pepco has cut his overtime hours, in particular, since he filed a discrimination complaint against the company.  PAC ¶ 116.

a.   <u>Claim 34:  Tolbert's Promotion Claim</u>

The PAC's allegation in support of claim 34 is brief and not enough to render a claim of racial discrimination plausible.  Tolbert alleges only that he "has been passed over for promotion no less than 9 times," without providing any further details.  PAC ¶ 138.  That is not enough to state a plausible claim.

b.   <u>Claim 35:  Tolbert's Vehicle Assignment Claim</u>

Tolbert's claim 35 is similar to Veney's vehicle assignment claim.  "Tolbert is the most senior employee and Test Specialist" in his department, PAC ¶ 138, but to date, he still has not received a company vehicle.  <u>Id.</u> ¶ 140.  He names specific white employees who, since Pepco obtained its fleet of new trucks, have received vehicle assignments.  <u>Id.</u> ¶ 141.  Moreover, Tolbert alleges that a less senior white employee received a company truck the day after an alleged "secret meeting" held by Tolbert's General Manager, Wayne Couto, who Tolbert says invited only white employees.  <u>Id.</u> ¶ 161, 165.  Tolbert states that he then filed a discrimination complaint against Couto, and that complaint has not been investigated.  <u>Id.</u> ¶ 166.  Reading the complaint in the light most favorable to Tolbert, these allegations support an inference of discrimination.  <u>See</u> <u>Moore</u>, 192 F. Supp. 3d at 40–41.  Thus, the Court will grant the motion for leave to amend as to claims 35 for Tolbert.

c.   <u>Claim 36:  Tolbert's Overtime Claim</u>

For many of the same reasons as the other Plaintiffs' overtime claims, Tolbert's overtime claim is plausible also.  Tolbert asserts that, since 2015, he has had "the least amount of overtime hours" of any employee, PAC ¶ 144, and in particular, "substantially less" than white employees because "White Test Specialists are given first preference in selection of overtime hours which pay double-time."  <u>Id.</u> ¶¶ 142–43; <u>id.</u> ¶ 144 (alleging that Pepco has cut his hours significantly

since he complained about racial discrimination to the D.C. Office of Human Rights).  Further, Tolbert claims to have done his own investigation into the overtime-hours disparity at Pepco; he alleges that he "learned that white employees are scheduled for Sunday work at a rate of pay double what they make Monday through Friday."  Id. ¶ 145.  On the other hand, when Tolbert is scheduled for weekend work, he works "Saturdays at a rate of pay only one-and-a-half times his regular hourly rate."  Id.  At this stage, these allegations are enough to raise an inference of discrimination, Moore, 192 F. Supp. 3d at 40–41, so the Court will grant the motion for leave to amend as to claim 36 for Tolbert.

> B.  DCHRA Retaliation Claims

Moving on to Count IV, under the DCHRA, "it is an unlawful discriminatory practice for an employer to retaliate against a person on account of that person's opposition to any practice made unlawful by the DCHRA."  Leftwich, 878 F. Supp. 2d at 97.  To make out a prima facie case of retaliation, like under federal law, a plaintiff must establish that he "(1) opposed an unlawful employment practice; (2) the employer took a materially adverse personnel action; and (3) a causal connection existed between the two."  Leyden v. Am. Accreditation Healthcare Comm'n, 83 F. Supp. 3d 241, 245 (D.D.C. 2015) (Cooper, J.); Howard Univ. v. Green, 652 A.2d 41, 45 (D.C. 1994) (noting Title VII case law is instructive for DCHRA retaliation claims).  And "[i]n the retaliation context, the 'adverse action' concept has a broader meaning," and "reach[es] any harm that 'well might have dissuaded a reasonable worker from making or supporting a charge of discrimination[.]'"  Baird v. Gotbaum, 662 F.3d 1246, 1249 (D.C. Cir. 2011) (quoting Burlington N. & Santa Fe Ry. Co. v. White ("BNSF"), 548 U.S. 53, 68 (2006)).

1.  *Stanton*

Stanton has five retaliation claims left for the Court to assess, one of which Pepco concedes can move forward.  See Pepco Surreply at 2.  That is claim 20, in which Stanton alleges that, in retaliation for his filing a discrimination complaint, he was required to work during the COVID-19 pandemic without the protective gear he requested.  PAC ¶¶ 104–105. Stanton alleges on "information and belief" that "other employees who have not filed discrimination complaints . . . have been provided with the appropriate protective gear[.]" Id. ¶ 105.  The Court will grant the motion for leave to amend as to claim 20 for Stanton.

But leave to amend on the remaining claims would be futile; these are claims 14, 15, 17, and 18.

First, claim 14 relates to Stanton's allegation that one supervisor "threatened that he would not tolerate Stanton making complaints against him."  PAC ¶ 85.  Stanton reported that confrontation to HR, and then "the General Supervisor moved Stanton to another Supervisor." Id. ¶¶ 85–86.  Simply put, Stanton "has not demonstrated that []he suffered any identifiable harm" from this change in supervisors.  Jones v. Bush, 160 F. Supp. 3d 325, 343 (D.D.C. 2016); Baloch v. Kempthorne, 550 F.3d 1191, 1199 (D.C. Cir. 2008) (holding that an action was not materially adverse when it "had no actual effects").  Indeed, common sense would seem to dictate that being moved away from a threatening supervisor is a *good* thing—and thus would not "dissuaded a reasonable worker" from filing complaints.  See Baird, 662 F.3d at 1249.  This claim fails.

Second, in claim 15, Stanton says that he "is constantly the subject of stares and derogatory comments" from "coworkers," not specifically his supervisors.  PAC ¶ 89.  That allegation does not amount to a materially adverse action either.  "Actionable retaliation claims

are limited to those where an employer causes '*material* adversity,' not 'trivial harms.'" Wiley
v. Glassman, 511 F.3d 151, 161 (D.C. Cir. 2007) (quoting BNSF, 548 U.S. at 68). This
allegation amounts to "petty slights or minor annoyances that often take place at work," which
are not actionable. Clemmons v. Acad. for Educ. Dev., 70 F. Supp. 3d 282, 301 (D.D.C. 2014).
Nor is it apparent how these slights from coworkers are connected to retaliation by Stanton's
employer—be it his supervisors or Pepco management.

      Third, for claim 17 Stanton alleges that, after he received a company vehicle, another
employee urinated in his assigned truck. PAC ¶ 98. He says that he reported this incident, but
Pepco did not investigate. Id. ¶¶ 98–99. If true, this is plainly an unacceptable act, and not
investigating it would amount to an adverse action that would dissuade a reasonable worker from
reporting discrimination. The PAC's allegations, however, provide no basis for the Court to
infer that this incident and the lack of investigation into it are connected to retaliation for any
protected activity. Stanton alleges that the incident occurred in 2019, id. ¶ 98, but at least
thirteen months separate it from his November 2017 internal discrimination complaint.
Id. ¶ 101. Courts have held that gaps of several months are too long to establish a causal
connection, and there are simply no other allegations supporting an inference that not
investigating this incident relates to Stanton's filing a discrimination complaint. See Mokhtar v.
Kerry, 83 F. Supp. 3d 49, 81 (D.D.C. 2015) (collecting cases). Although the Court could
imagine allegations where this event could easily support a retaliation claim, this PAC does not
provide them. Thus, this claim fails as well.

      Fourth, claim 18 relates to Pepco allegedly "refus[ing] to assign highly technical work to
Stanton." PAC ¶ 100. Again, Stanton provides no basis in the PAC or the briefing to infer that
this occurred in retaliation for any protected activity. And there is at least a two-year gap

between Stanton's complaint regarding racial discrimination and this alleged refusal "to assign highly technical work." Id. ¶¶ 100, 102. This temporal gap is even longer than claim 17, and again Stanton does not explain why the two-year gap here should be treated any different than similar gaps in other cases. Mokhtar, 83 F. Supp. 3d at 81.

### 2.  Veney

Veney has a single retaliation claim remaining, claim 29, which relates to his assignment to a Pepco substation without adequate training. PAC ¶ 128 (also alleging that Pepco shut down the substation due to asbestos and did not provide proper asbestos abatement). This claim could not survive a motion to dismiss. For starters—on these allegations—it is highly questionable whether this assignment rises to the level of "materially adverse action." See Guillen-Perez v. District of Columbia, 415 F. Supp. 3d 50, 63–64 (D.D.C. 2019) (Cooper, J.) (holding that "punitive scheduling" did amount to an adverse employment action); cf. Jones, 160 F. Supp. 3d at 343–44 (same, for a reassignment that had no other "materially adverse consequences") (citation omitted). But even if it were, there is another fundamental problem: Veney never provides any explanation in the PAC or briefing how this assignment is connected to retaliation for any protected activity. Accordingly, the Court will not permit Veney to plead any retaliation claims in an amended complaint.

### 3.  Tolbert

Lastly, Tolbert has two retaliation-based claims left. Claim 41 concerns his exclusion from the Pepco "promotion board," which "directly impacts which PEPCO employees receive promotions." PAC ¶¶ 155–56. And Claim 43 relates to his exclusion from the alleged secret meeting of only white employees held by General Manager Couto, mentioned above. Id. ¶ 161.

a.   <u>Claim 41:  Tolbert's Exclusion from the Promotion Board</u>

The Court will grant Tolbert leave to amend as to claim 41.  At this stage, it is reasonable to infer that exclusion from the promotion board "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination[.]"  <u>Baird</u>, 662 F.3d at 1249.  Pepco asserts that Tolbert "has not alleged any tangible effects on his employment" because of his exclusion from the board, and therefore, there is no adverse action.  Mot. Dismiss at 28.  But materially adverse actions can also stem from being denied "supervisory" or "programmatic responsibilities."  <u>Geleta v. Gray</u>, 645 F.3d 408, 411 (D.C. Cir. 2011); <u>Crady v. Liberty Nat'l Bank & Trust Co. of Ind.</u>, 993 F.2d 132, 136 (7th Cir. 1993) (holding that materially adverse actions "might be indicated" by "a less distinguished title," "significantly diminished material responsibilities, or other indices that might be unique to a particular situation."), <u>accord</u> <u>Burlington</u>, 524 U.S. at 761.

The PAC's allegations meet this standard.  To begin, Tolbert alleges that after he filed his discrimination complaint, he was denied an appointment to the board.  PAC ¶ 158.  According to Tolbert, "[i]n the last 37 years, [every] senior Test Specialist"—which is now Tolbert—"has always been appointed" to this board, except him.  <u>Id.</u> ¶¶ 155, 158.  Tolbert asserts that neither General Manager Couto nor his union representative has provided "a reason why Tolbert is the first senior Test Specialist who was denied the benefit of serving on the promotion board."  <u>Id.</u> ¶ 158.  The board is important, Tolbert explains, because it "directly impacts" Pepco employee promotions.  <u>Id.</u> ¶ 156.  In particular, the PAC suggests that the board plays a role in promoting employees from Relay Tester to Test Specialist.  <u>Id.</u> ¶ 157.  Tolbert is already a Test

Specialist, so it is not clear how his salary or future promotion prospects are impacted.[3]  Still, at least at this stage and taking Tolbert's allegations as true, it is not hard to see how having influence over promotions is a "material responsibilit[y]" which Tolbert has been denied.  See Crady, 993 F.2d at 136.

Fuller context also helps this claim.  Tolbert asserts that the number of white board members has "exceeded [the] percentage of white PEPCO employees as compared to African American" employees, and that "African American employees have historically been underrepresented on the promotion board[.]"  PAC ¶¶ 156–57.  Tolbert attributes the lagging promotion of African-American employees to the makeup of the board.  Id. ¶ 157.  And again, the Senior Test Specialist has apparently always served on the board—except Tolbert, who was purportedly denied this appointment following his discrimination complaints.  Reading these allegations in the light most favorable to Tolbert, it is fair to infer that a reasonable worker would be dissuaded from making or supporting a charge of discrimination by being denied an appointment to a board that has influence over promotions and has always had a seat (until now) for employees in the same position as Tolbert.

b.  Claim 43:  Tolbert's Exclusion from a Meeting

Tolbert's claim 43, however, fails.  In support of this claim, the PAC alleges that General Manager Couto had a "secret meeting" with "only" white employees, and that "Couto intentionally excluded Tolbert from this meeting in retaliation" for his discrimination charges.  PAC ¶ 161.  The allegation of retaliatory motive is conclusory, and it is contradicted by the

_____

[3] Although it is not clear from the PAC, Plaintiffs state in their reply brief that Tolbert's exclusion from the board "could reasonably translate to a denial of Tolbert's own ability to receive promotions," presumably to a position (not mentioned by Plaintiffs) above Test Specialist.  See Pls. Reply at 11.

statement that *all* African-American employees—not just Tolbert—were excluded from this meeting.  See id. ("*only* white PEPCO employees were invited") (emphasis added).  That reflects alleged blanket racial discrimination (and helps Tolbert's Section 1981 race discrimination claims, explained above), but it does not suggest an adverse action targeted at someone who filed a discrimination complaint.  Moreover, as Pepco points out, Tolbert has not alleged that any particular harm arose out of his exclusion from this secret meeting.  See Mot. Dismiss at 28.  Plaintiffs have no response.  CD Int'l Enters., 251 F. Supp. 3d at 46 (party conceded issue by failing to address it in opposition brief).  And without more allegations, it is difficult for the Court to see how—in this proposed amended complaint—exclusion from this particular meeting amounts to a materially adverse action.

## IV.  Conclusion

For the foregoing reasons, the Court will grant in part and deny in part Plaintiffs' motion for leave to amend the complaint.  Pepco's motion to dismiss as to the remaining claims is denied as moot.  A separate Order will follow.

_____
CHRISTOPHER R. COOPER
United States District Judge

Date:  September 15, 2021